IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DONALD JACOBS, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. 20-4016 |
| | : | |
| v. | : | |
| | : | |
| COUNTY OF BUCKS, JOSEPH KHAN, | : | |
| and MARGARET MCKEVITT, | : | |
| | : | |
| Defendants. | : | |

**<u>MEMORANDUM OPINION</u>**

Smith, J.                                                          June 22, 2022

This suit arises out of a county's termination of the plaintiff, its longtime chief information officer. Prior to the termination, the plaintiff had requested intermittent leave under the Family and Medical Leave Act ("FMLA") to obtain medical treatment and undergo surgery. Around the same time, the plaintiff attended a meeting with county employees and supervisors, including the county's chief operating officer ("COO") and the county solicitor, during which the plaintiff's involvement with a finder's fee issue was discussed. The finder's fee issue concerns a conflict of interest originating from a third-party actor, employed by the Commonwealth of Pennsylvania, who investigators determined to be simultaneously providing services to the county under the name of a private consulting firm.

During the meeting, the plaintiff not only discussed the issue with the finder's fee and answered questions about it, but also discussed his upcoming surgery. Some of the meeting's attendees concluded the plaintiff's answers had been dishonest regarding the finder's fee and recommended his termination. Shortly thereafter, and at least 43 days after the plaintiff requested FMLA leave, the county commissioners terminated his employment by unanimous vote.

The plaintiff subsequently commenced this action against the county, the county's COO, and the county solicitor, claiming that his termination stemmed from requesting FMLA leave, or alternatively, from his own, prior reporting of the finder's fee issue to county employees. The plaintiff asserts the termination amounted to (1) retaliation and interference under the FMLA (2) a violation of Pennsylvania Whistleblower Law, and (3) a violation of 42 U.S.C. § 1983.

The defendants have now moved for summary judgment on all counts in the complaint. As discussed at length below, the court finds that the defendants are entitled to summary judgment on the FMLA and section 1983 claims. Regarding the FMLA claims, the plaintiff (1) has abandoned any FMLA interference claim, and (2) is unable to establish a *prima facie* case of FMLA retaliation because he has not shown that there is a genuine issue of material fact as to whether the adverse employment action was causally related to his invocation of FMLA rights. As for the section 1983 claim, the COO and county solicitor are entitled to qualified immunity, as their conduct in the termination did not violate any constitutional right. Finally, with regard to the Pennsylvania Whistleblower state law claim, the court declines to exercise supplemental jurisdiction and will dismiss the claim without prejudice to the plaintiff pursuing it in the appropriate state court.

## I.    PROCEDURAL HISTORY

The plaintiff, Donald Jacobs ("Jacobs"), initiated this action by filing a complaint against the County of Bucks, Joseph Khan (County Solicitor), and Margaret McKevitt (County COO) ("the defendants") on August 18, 2020. *See* Doc. No. 1. On December 18, 2020, the defendants filed an answer and asserted affirmative defenses. *See* Doc. No. 7. With the pleadings being closed, the court held an initial pretrial conference with counsel on January 21, 2021, and entered an initial scheduling order on January 22, 2021. *See* Doc. Nos. 8, 9.

On June 9, 2021, Jacobs filed a motion to amend the complaint, which the defendants opposed on June 23, 2021. *See* Doc. Nos. 15, 17. The court held a telephonic hearing on the motion

on June 28, 2021, and subsequently denied the motion to amend on August 17, 2021. *See* Doc. Nos. 19, 22.

The defendants filed the present motion for summary judgment on October 20, 2021. *See* Doc. No. 27. Jacobs filed a response in opposition to the motion and separately filed exhibits on November 12, 2021. *See* Doc. Nos. 30–36. Soon after, on November 22, 2021, the defendants filed a reply brief in further support of their motion. *See* Doc. No. 37. The court held oral argument on the motion on December 15, 2021. *See* Doc. No. 39. The defendants' motion for summary judgment is now ripe for adjudication.

## II.   FACTUAL BACKGROUND

On July 5, 2005, the County hired Jacobs as a senior information-security ("IS") manager. *See* Defs.' Statement of Undisputed Facts ("Defs.' Facts") at ¶ 1, Doc. No. 27-2; Pl.'s Resp. to Defs.' Statement of Allegedly Undisputed Material Facts ("Pl.'s Resp.") at ¶ 1, Doc. No. 30. Effective April 5, 2006, the County promoted Jacobs to the position of chief information officer ("CIO"), which Jacobs held until the County terminated his employment effective March 2, 2020. *See* Defs.' Facts at ¶ 2; Pl.'s Resp. at ¶ 2. Jacobs' employment was a non-union, at-will position. *See* Defs.' Facts at ¶ 3; Pl.'s Resp. at ¶ 3. As CIO, Jacobs' duties included, *inter alia*, directing the priorities and work program within the information technology department, negotiating complex proposals and contracts for the purchase of products and services, developing partnership agreements, and fulfilling responsibilities assigned by other executives. *See* Defs.' Facts at ¶ 4; Pl.'s Resp. at ¶ 4. Prior to his termination, Jacobs characterized his position by saying, "I run the IT Department." *See* Defs.' Facts at ¶ 4; Pl.'s Resp. at ¶ 4.

In 2012, Jacobs became acquainted with Robert Ayers ("Ayers"), and thereafter worked closely with him. *See* Defs.' Facts at ¶ 5; Pl.'s Resp. at ¶ 5. Ayers, in his capacity as a

Commonwealth employee, had assisted after the County experienced a malware cyber-attack in 2021. *See id.* At some point, Jacobs and Ayers had conversations which included Ayers expressing interest in providing services to the County in the future. *See* Defs.' Facts at ¶ 7; Pl.'s Resp. at ¶ 7. Jacobs was receptive to this suggestion because he thought Ayers' previous work for the County had been "wonderful." *See* Defs.' Facts at ¶ 7; Pl.'s Resp. at ¶ 7. Jacobs and Ayers had additional contact in 2016, when Ayers assisted the County following another cyber-attack. *See* Defs.' Facts at ¶ 8; Pl.'s Resp. at ¶ 8.

Following the 2016 cyber-attack, Jacobs advised his supervisors at the time, David Boscola ("Boscola") and Brian Hessenthaler ("Hessenthaler"), that the County needed to retain a cyber security consultant. *See* Defs.' Facts at ¶ 9; Pl.'s Resp. at ¶ 9. Subsequently, Jacobs, Boscola, and Hessenthaler discussed the impropriety of using Ayers for County work due to the potential conflict of interest presented by Ayers' employment with the Commonwealth. *See* Defs.' Facts at ¶¶ 10–11; Pl.'s Resp. at ¶¶ 10–11.[1] During these discussions, Hessenthaler told Jacobs that he did not want the County to employ Ayers. *See* Ex. C., Dep. of Pl., at ECF p. 65, Doc. No. 27-4 ("The closest I recall [Hessenthaler] ever saying we could not employ [Ayers] was [Hessenthaler] saying he didn't want him there at the County.").

As of late 2016, Jacobs knew, or had reason to know, that Ayers was providing services to the County through a private company called CyberRisk Services ("CRS"). *See* Defs.' Facts at ¶¶ 12–13; Pl.'s Resp. at ¶¶ 12–13.[2] This situation is the origin of the "finder's fee issue" subject to two investigations discussed at greater length below.

---

[1] The parties dispute the exact details of those conversations. The defendants claim that Hessenthaler told Jacobs that he did not want to retain Ayers due to a potential conflict of interest, and that Jacobs was aware that both Hessenthaler and Boscola opposed using Ayers for County work. *See* Def.'s Facts at ¶¶ 10–11; Pl.'s Resp. at ¶¶ 10–11. The plaintiff denies ever being given an explicit instruction. *See* Pl.'s Resp. at ¶ 10.

[2] Jacobs denies this fact. *See* Pl.'s Resp. at ¶¶ 12–13. However, Jacobs has failed to identify the asserted genuine dispute of material fact and to provide a citation to the specific portion of the record establishing the dispute, as required by this court's policies and procedures. Instead, Jacobs issued a blanket denial and cited to its

Over the course of his employment with the County, Jacobs applied for and was granted FMLA leave on multiple occasions, including: June 19–23, 2006; May 6–23, 2012; intermittently between May 16 and November 16, 2013; September 3–22, 2013; intermittently between July 1, 2013, and May 16, 2014; and March 25 through April 21, 2014. *See* Defs.' Facts at ¶ 66; Pl.'s Resp. at ¶ 66. These periods of FMLA leave were granted separately from other non-FMLA leaves of absence taken by Jacobs. *See* Defs.' Facts at ¶ 67; Pl.'s Resp. at ¶ 67.

On January 8, 2020, Jacobs emailed various County employees, including Hessenthaler and Boscola, informing them that starting January 14, 2020, he would need to be out of the office for medical treatment on certain dates. *See* Defs.' Facts at ¶ 68; Pl.'s Resp. at ¶ 68. Several of the email's recipients responded, expressing their sympathies for Jacobs' medical issues and wishing him luck with treatment. *See* Defs.' Facts at ¶ 69; Pl.'s Resp. at ¶ 69. The next day, Jacobs submitted a request for intermittent FMLA leave to the County's health insurance claims processor. *See* Defs.' Facts at ¶ 70; Pl.'s Resp. at ¶ 70.

On January 10, 2020, Jacobs' FMLA leave request was granted subject to requirements, such as the receipt of certifications from Jacobs' healthcare provider. *See* Defs.' Facts at ¶ 71; Pl.'s Resp. at ¶ 71. One week later, the County's health insurance claims processor sent Jacobs a letter reminding Jacobs of the requirement that his healthcare provider must provide certifications by January 25, 2020. *See id*. Between January 15 and January 17, 2020, Jacobs emailed with a member of the County's human resources department, who told Jacobs that certain medical documentation needed to be submitted directly to the healthcare insurance claims processor. *See* Defs.' Facts at ¶ 72; Pl.'s Resp. at ¶ 72. On February 4, 2020, the healthcare insurance claims processor issued a letter to Jacobs denying the request for intermittent FMLA leave because it did

---

counterstatement of material facts. *See id*. The court thoroughly reviewed the cited portions of Jacobs' counterstatement and found no support from the record creating a genuine issue of material fact. *See id.* at ¶ 11.

not receive documentation from Jacobs' treating provider. *See* Defs.' Facts at ¶ 72; Pl.'s Resp. at ¶ 72. McKevitt, shortly before assuming the position of interim COO on February 14, 2020, learned from a co-worker that Jacobs had recently not attended a meeting due to receiving cancer treatment. *See* Defs.' Facts at ¶ 73; Pl.'s Resp. at ¶ 73.[3]

On January 16, 2020, shortly before the County denied the FMLA request, two special investigators for the Pennsylvania State Ethics Commission interviewed Jacobs in connection with an investigation into Ayers for "allegedly utilizing his position for private financial benefit while he was employed with the Commonwealth of Pennsylvania." *See* Defs.' Facts at ¶¶ 75, 76; Pl.'s Resp. at ¶¶ 75, 76. Around this time, the County initiated its own investigation into the finder's fee issue. *See* Defs.' Facts at ¶ 79; Pl.'s Resp. at ¶ 79.[4] The County personnel participating in this investigation included Margaret McKevitt, Joseph Khan, and Virginia Hardwick ("Hardwick") (respectively the interim County COO, County Solicitor, and an attorney from the Solicitor's Office). *See* Defs.' Facts at ¶ 79; Pl.'s Resp. at ¶ 79.

On February 21, 2020, Jacobs attended a meeting during which he was interviewed by McKevitt, Khan, and Hardwick. *See* Defs.' Facts at ¶ 82; Pl.'s Resp. at ¶ 82. The topics discussed in that meeting are heavily disputed. With the exception of Jacobs, no party to the meeting affirmatively remembers Jacobs' FMLA leave and upcoming cancer surgery being discussed at the meeting. *See* Defs.' Facts at ¶ 74; Pl.'s Resp. at ¶ 74. Jacobs remembers his cancer surgery being brought up, and McKevitt rolling her eyes in response. *See* Pl.'s Counterstatement of Material Facts at ¶ 41, Doc. No. 30-1. The finder's fee issue was discussed at length, with Jacobs

---

[3] Although Jacobs purports to deny this statement contained in the defendants' statement of undisputed material facts, *see* Pl.'s Resp. at ¶ 73, he does not include any references to the record that would contradict this statement. Instead, he appears to identify the portions of the record which support the defendants' statement, *see id.*

[4] While Jacobs claims that the investigation was "inadequate," Pl.'s Resp. at ¶ 79, he does not identify any evidence to show that an investigation did not occur. *See id.*

stating that he had previously raised the finder's fee issue with two members of the Bucks County Solicitor's Office, Kay Weeder and Don Williams. *See id.* at ¶ 139. In contrast, the County's investigation concluded, *inter alia*, that Jacobs had been dishonest in the February 21, 2020 meeting when answering questions about his knowledge of the situation surrounding Ayers. *See* Defs.' Facts at ¶¶ 83, 84; Pl.'s Resp. at ¶¶ 83, 84.

The February 21, 2020 meeting concluded with Jacobs being put on administrative leave pending further investigation. *See* Defs.' Facts at ¶ 82; Pl.'s Resp. at ¶ 82.[5] Soon thereafter, the County Commissioners unanimously voted to terminate Jacobs' employment. *See* Defs.' Facts at ¶ 93; Pl.'s Resp. at ¶ 93. On March 2, 2020, a letter was drafted, terminating Jacobs' employment and providing a variety of reasons for termination.[6] *See* Defs.' Facts at ¶ 92; Pl.'s Resp. at ¶ 92. As a result, Jacobs applied for unemployment benefits and initiated this suit on August 18, 2020. *See* Defs.' Facts at ¶ 94; Pl.'s Resp. at ¶ 94.

## III.   DISCUSSION

### A.   <u>Standard of Review – Motions for Summary Judgment</u>

A district court "shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Additionally, "[s]ummary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. N.J.*

---

[5] As with some of his other denials, Jacobs denies the defendants' statement, but he has not identified any evidence showing that following the February 21, 2020 meeting, the County placed Jacobs on administrative leave pending further investigation. *See* Pl.'s Resp. at ¶ 82.

[6] All of the reasons provided could be interpreted as applying to the finder's fee situation. The reasons include, *inter alia*, insubordination, dishonesty, failure to report illegal/inappropriate activity, falsification, violation of HR procedures, unsatisfactory work performance, etc. *See* Defs.' Facts at ¶ 93; Pl.'s Resp. at ¶ 93.

*State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

The party moving for summary judgment has the initial burden "of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). Once the moving party has met this burden, the non-moving party must counter with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted); *see* Fed. R. Civ. P. 56(c) (stating that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . .; or . . . [by] showing that the materials cited do not establish the absence . . . of a genuine dispute"). The non-movant must show more than the "mere existence of a scintilla of evidence" for elements on which the non-movant bears the burden of production. *Anderson*, 477 U.S. at 252. Bare assertions, conclusory allegations, or suspicions are insufficient to defeat summary judgment. *See Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982) (indicating that a party opposing a motion for summary judgment may not "rely merely upon bare assertions, conclusory allegations or suspicions"); *Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172 F.3d 238, 252 (3d Cir. 1999) (explaining that "speculation and conclusory allegations" do not satisfy non-moving party's duty to "set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor"). Additionally, the non-

moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Thus, it is not enough to "merely [] restat[e] the allegations" in the complaint; instead, the non-moving party must "point to concrete evidence in the record that supports each and every essential element of his case." *Jones v. Beard*, 145 F. App'x 743, 745–46 (3d Cir. 2005) (citing *Celotex*, 477 U.S. at 322). Moreover, arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109–10 (3d Cir. 1985).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and the court should grant summary judgment in favor of the moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted). Further, when one party's claims are "blatantly contradicted by the record, so that no reasonable jury could believe it," the court should not take those claims as true for the "purposes of ruling on a Motion for Summary Judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### B.     Analysis

In their motion for summary judgment, the defendants argue that Jacobs (1) has not established a *prima facie* case of FMLA discrimination, (2) abandoned any claim of FMLA interference, (3) failed to state a claim for a section 1983 violation, or in the alternative, is barred by qualified immunity, and (4) cannot sustain the Pennsylvania Whistleblower Law claim. The court will address each of these arguments in turn.

### 1.     FMLA Retaliation

"To prevail on a retaliation claim under the FMLA, the plaintiff must prove that (1) [he] invoked h[is] right to FMLA-qualifying leave, (2) [he] suffered an adverse employment decision, and (3) the adverse action was causally related to h[is] invocation of rights." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 301–02 (3d Cir. 2012) (citation omitted). FMLA retaliation claims based on circumstantial evidence, such as the instant case, are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See id.* at 302; *see also Leathers v. GlaxoSmithKline, LLC.*, Civ. A. No. 2:19-cv-4939-JMG, 2021 WL 1837436, at *7 (E.D. Pa. May 7, 2021) (explaining certain retaliation claims are analyzed under *McDonnell Douglas* burden-shifting framework). Under *McDonnell Douglas*, a plaintiff must establish a *prima facie* case, at which point the burden of production shifts to the employer to "articulate some legitimate, nondiscriminatory reason for its decision." *Lichtenstein*, 691 F.3d at 302 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). If the employer can meet that "minimal burden," the plaintiff must then identify some evidence from which a factfinder could "reasonably . . . disbelieve [the employer's] articulated legitimate reasons." *Id.* (quoting *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir. 1994)).

Here, the only contested issue is whether Jacobs has established that the adverse employment action was causally related to his invocation of FMLA rights. *See* Defs.' Br. in Supp. of Mot. for Summ. J. ("Defs.' Br.") at 28–31, Doc. No. 27-1. In determining whether a plaintiff has established a causal link, the court analyzes the following two factors: "(1) a showing that the two events were close in time or (2) evidence of ongoing antagonism toward the employee." *Capps v. Mondelez Glob. LLC*, 147 F. Supp. 3d 327, 336 (E.D. Pa. 2015), *aff'd*, 847 F.3d 144 (3d Cir. 2017).

Turning first to temporal proximity,

[w]here temporal proximity is found to be unduly suggestive, this alone is sufficient to create an inference of causation. However, when the court finds that temporal proximity is not unduly suggestive, it must then determine whether the proffered evidence, taken as a whole, suffices to raise such an inference. At that time, the court may consider such additional evidence as acts of intervening antagonism, inconsistencies in the employer's articulated reasons for termination, or other evidence supporting an inference of retaliatory animus.

*Leathers*, 2021 WL 1837436, at *7 (internal citations omitted).

Here, Jacobs submitted his FMLA request on January 9, 2020. The decision to place Jacobs on administrative leave occurred 43 days later, on February 21, 2020. The County terminated Jacobs' employment on March 2, 2020. Jacobs argues that he raised his medical leave and upcoming surgery during the February 21, 2020, meeting, and therefore the real temporal proximity is only 9 days. *See* Pl.'s Resp. at 32. This argument is misplaced, because "[c]ourts measure temporal proximity from the first date on which the litigant engaged in his protected activity." *Capps*, 147 F. Supp. 3d at 337. As such, January 9, 2020, is the operative start date and the court must evaluate the 43-day period between this date and the placement of Jacobs on administrative leave. The court does not find this 43-day gap to be unduly suggestive, and fellow courts within this district have "routinely granted summary judgment in cases where several weeks

or months have elapsed between an employee's invocation of FMLA rights and the adverse employment action." *Leathers*, 2021 WL 18374336 at *8 (citing *Duncan v. Chester Cnty. Hosp.*, 677 F. App'x 58, 62 (3d Cir. 2017) (34 days not unduly suggestive); *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) ("[A] gap of three months . . . without more, cannot create an inference of causation and defeat summary judgment."); *Blakney v. City of Philadelphia*, 559 F. App'x 183, 186 (3d Cir. 2014) ("[A] temporal proximity greater than ten days requires supplementary evidence of retaliatory motive[.]"); *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (concluding that three weeks was insufficient to raise inference of causation)).

The court also does not find a pattern of ongoing antagonism, despite Jacobs' argument to the contrary.

> A pattern of antagonism is gleaned from looking at the record as a whole and has been found where an employee is subject to a constant barrage of written and verbal warnings and disciplinary action, all of which occurred soon after plaintiff's initial complaints and continued until his discharge, or is subject to [r]epeated violations for trivial matters and unusually close supervision following protected action[.] A pattern of antagonism, however, is more than a series of disciplinary actions; a plaintiff must offer [a] basis for linking the disciplinary actions to her [protected activity].

*Wells v. Retinovitreous Assocs., Ltd.*, Civ. A. No. 15-5675, 2016 WL 3405457, at *3 (E.D. Pa. June 21, 2016) (internal quotations and citations omitted), *aff'd*, 702 F. App'x 33 (3d Cir. 2017).

The defendants contend that not only is there an absence of any evidence of antagonism in the record, but there is also significant evidence of the defendants' support relating to Jacobs' FMLA requests. *See* Defs.' Br. at 30. For example, (1) Jacobs requested and received FMLA leave on multiple occasions prior to the 2020 FMLA request, (2) Jacobs' January 8, 2020 email regarding his upcoming surgery was met with supportive responses, and (3) the denial of FMLA leave in January 2020 occurred solely due to the lack of receipt of required certifications.

12

In arguing a pattern of antagonism exists, Jacobs contends it is suspicious that three individuals do not remember whether his upcoming cancer surgery was discussed in the February 21, 2020 meeting. Even coupled with McKevitt allegedly rolling her eyes during the meeting at the mention of Jacobs' cancer surgery, this evidence does not rise to the level of a pattern of antagonism.

Jacobs also argues that the "bagful" of reasons provided in his termination letter, coupled with the timing of his FMLA request and upcoming surgery, amount to inconsistency and pretext for discrimination. Although "[c]ourts have considered inconsistent reasons given by an employer for an employee's termination when analyzing the causation prong," *Atchison v. Sears*, 666 F. Supp. 2d 477, 492 (E.D. Pa. 2009) (citations omitted), the evidence Jacobs points to does not establish inconsistency. Instead, as mentioned above, all the reasons provided in the letter are consistent with the County's purported belief that Jacobs acted improperly in connection with the finder's fee issue. At bottom, looking at the record as a whole, the court does not find any evidence of an inference of retaliatory animus in connection with Jacobs' request for FMLA leave.

Finding neither temporal proximity, a pattern of antagonism, nor inconsistency in the County's reasons for termination, Jacobs has not identified sufficient facts (or a genuine issue of material fact) to show a causal connection between his termination and his invocation of FMLA rights. Accordingly, the court will grant the defendants' motion for summary judgment as to the FMLA retaliation claim.

### 2.    FMLA Interference

The defendants argue that Jacobs has abandoned any FMLA interference claim included in the complaint. *See* Defs.' Br. at 40–41. In support of this position, the defendants offer one of Jacobs' responses to their interrogatories which states that "[t]his case does not concern a denial

of an FMLA leave request, but rather retaliation for having applied for and received such leave . . . ." *Id*. (citation omitted). Although the defendants believe this is sufficient in and of itself, they also contend that the court should grant summary judgment on any interference claim because it is an impermissible "repackaging" of the FMLA retaliation claim. *Id*. at 41.

After evaluating the complaint and response in opposition to the motion for summary judgment, the court agrees with the defendants that any FMLA interference claim originally brought by Jacobs has since been abandoned or incorporated into the FMLA retaliation claim. Jacobs' response in opposition to the motion for summary judgment does not deny the defendants' contention that he has abandoned any FMLA interference claim. *See generally* Pl.'s Resp. In addition, Jacobs' brief in opposition to the motion for summary judgment contains no designated section for an FMLA interference claim, despite having such sections for each other claim. *See, e.g.*, Pl.'s Mem. of Law in Resp. to Defs.' Mot. for Summ J. ("Pl.'s Mem.") at 28–51, Doc. No. 30-2. Jacobs' only reference to FMLA interference is included under the heading "The Law Relating to FMLA Retaliation Claims," and that section only addresses the elements of a *prima facie* case of FMLA retaliation. *See id*. at 29.

The elements for a *prima facie* case of FMLA retaliation and FMLA interference differ. *See Ross v. Gilhuly*, 755 F.3d 185, 191–92 (3d Cir. 2014) (discussing *prima facie* elements of FMLA retaliation claims and FMLA interference claims). For an FMLA interference claim, a plaintiff must establish the following:

> (1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA.

*Id.* (citations omitted). As argued by the defendants, Jacobs has explicitly conceded that as to the fifth element of an interference claim, this case is not about the denial of FMLA leave, but instead concerns only FMLA retaliation.[7] Reviewing the record in the light most favorable to Jacobs as the non-moving party, the court finds no evidence to support that the defendants denied him any benefit he was entitled to under the FMLA. Accordingly, the court will grant summary judgment as to the FMLA interference claim.

### 3.   Section 1983 Claim

Jacobs also asserts a two-part claim for a violation of section 1983 against two of the defendants, Khan and McKevitt, alleging the termination violated his rights under both the First and Fourteenth Amendments. *See* Compl. at 12–13. Section 1983 provides in pertinent part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983. When attempting to establish a claim under section 1983, a plaintiff must allege and prove that a "person" deprived the plaintiff of a constitutional right while acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 49 (1988) ("To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law.").

---

[7] For example, several of Jacobs' responses to interrogatories include, "[t]his case does not concern a denial of an FMLA leave request, but rather retaliation for having applied for and received such leave and violation of the Pennsylvania Whistleblower Act." Defs.' Ex. CC, Pl.'s Resp. to Defs.' First Set of Interrogs., at ECF p. 905, Doc. No. 27-4.

Here, Khan and McKevitt primarily argue that they are entitled to qualified immunity as to the section 1983 claim. *See* Defs.' Br. at 52–57. Jacobs' only argument in opposition is that the defendants failed to originally plead qualified immunity as an affirmative defense. *See* Pl.'s Mem. at 50.

As to qualified immunity, Jacobs is initially correct that, because it is an affirmative defense, "it ***should*** be asserted in the appropriate responsive pleading" under Rule 8(c) of the Federal Rules of Civil Procedure. *Eddy v. Virgin Islands Water and Power Auth.*, 256 F.3d 204, 209 (3d Cir. 2001) (emphasis added). Nonetheless, "the failure to [raise qualified immunity in the appropriate responsive pleading] does not automatically result in waiver." *Id.* (citations omitted); *see also Oliver v. Roquet*, 858 F.3d 180, 188 (3d Cir. 2017) (explaining that "there is no firm rule as to when a defendant must raise this affirmative defense" (citation and internal quotation marks omitted)). Thus, qualified immunity is not waived by a defendant who raises it later in a case, even after trial, so long as the plaintiff is not prejudiced. *Oliver*, 858 F.3d at 188 (citation omitted); *see also Eddy*, 256 F.3d at 209 ("Thus, [e]ven though a motion for summary judgment is not the most appropriate way to raise a previously unpled defense of immunity, in cases in which the plaintiff was not prejudiced, we have held that there was no waiver." (internal quotation marks and citations omitted)). Jacobs has not argued prejudice in this regard, *see* Pl.'s Mem. at 50, and the court finds none. Thus, it is evident that Khan and McKevitt are not barred from raising qualified immunity as a defense at the summary judgment stage.

"Qualified immunity is an affirmative defense available to government officials sued in their personal capacities." *Brown v. Cwynar*, 484 F. App'x 676, 680 (3d Cir. 2012). "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Rivas-Villegas v.*

*Cortesluna*, 142 S. Ct. 4, 7 (2021) (citation and internal quotation marks omitted). A right is clearly established "when it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* (citation and internal quotations marks omitted). The doctrine of qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *City of Tahlequah, Okla. v. Bond*, 142 S. Ct. 9, 11 (2021) (citation and internal quotation marks omitted).

Here, Khan and McKevitt, in their respective roles as County Solicitor and COO, are government officials sued in their personal capacities for their alleged roles in Jacobs' termination. Thus, they are entitled to qualified immunity if their conduct did not violate a constitutional right of which a reasonable person would have known.

Beginning with Jacobs' First Amendment claim,

[t]o prevail on a § 1983 First Amendment retaliation claim, the plaintiff must prove that (1) he engaged in constitutionally protected conduct, (2) the defendant engaged in retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link [existed] between the constitutionally protected conduct and the retaliatory action.

*Palardy v. Twp. of Millburn*, 906 F.3d 76, 80–81 (3d Cir. 2018) (citation and internal quotation marks omitted). Although Jacobs is a public employee, "[p]ublic employees do not renounce their First Amendment rights upon employment; however, 'the government's countervailing interest in controlling the operation of its workplaces' limits the First Amendment's ordinarily broad protections." *Flora v. Cnty. of Luzerne*, 776 F.3d 169, 174 (3d Cir. 2015) (quoting *Lane v. Franks*, 573 U.S. 228, 235 (2014)). Public employees establish a First Amendment retaliation claim when they show that (1) the speech in question is protected by the First Amendment and, (2) "that the speech was a substantial or motivating factor in what is alleged to be the employer's retaliatory action." *Id.* (citing *Gorum v. Sessoms,* 561 F.3d 179, 184 (3d Cir. 2009)).

For the first prong,

> [a] public employee's statement is protected by the First Amendment when: "(1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have 'an adequate justification for treating the employee differently from any other member of the general public' as a result of the statement he made."

*Id*. at 175 (quoting *Hill v. Borough of Kutztown,* 455 F.3d 225, 241–42 (3d Cir. 2006)). In determining whether an employee spoke as a private citizen, "the responsibility of a district court . . . is to ask whether the speech at issue was outside the scope of [the employee's] ordinary job responsibilities." *Id*. at 179 (citation and internal quotation marks omitted).

Here, the only potential speech alleged is Jacobs' disputed reporting of the finder's fee issue to two county employees, Weeder and Williams. Khan and McKevitt argue that because Jacobs' report owed its existence to Jacobs' responsibilities as CIO, Jacobs was not speaking as a private citizen in reporting the potential finder's fee issue. *See* Defs.' Br. at 49. While the court disagrees with the defendants' use of the "owes its existence to" and "related-to" standards, the court does find that Jacobs' alleged reporting of the finder's fee issue would fall within Jacobs' ordinary duties as CIO. The facts present here differ from cases in which an employee reported potential wrongdoing to a third-party or commenced a lawsuit against their employer. *See, e.g.*, *Flora*, 776 F.3d at 180 (vacating dismissal of Chief Public Defender's First Amendment claim against county-employer due to district court's use of 'related-to' test instead of 'scope of ordinary duties' test); *Dougherty v. Sch. Dist. of Philadelphia*, 772 F.3d 979, 993 (3d Cir. 2014) (agreeing plaintiff spoke as private citizen in reporting potential employer's wrongdoing to outside newspaper).[8]

---

[8] In the alternative, the court finds that Jacobs abandoned his First Amendment retaliation claim by not addressing any of the defendants' arguments that he had failed to establish a *prima facie* case in his response in opposition to the motion for summary judgment. *See* Pl.'s Mem. at 49–51; *see, e.g.*, *McCowan v. City of Philadelphia*, Civ. A. No. 19-3326-KSM, 2022 WL 1557779, at *17 (E.D. Pa. May 17, 2022) ("Plaintiffs not only failed to mention constructive

Turning to Jacobs' Fourteenth Amendment due process claim, the Fourteenth Amendment to the United States Constitution protects against the deprivation of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1. "The first step in analyzing a due process claim is to determine whether the 'asserted individual interest . . . [is] encompassed within the [F]ourteenth [A]mendment's protection of life, liberty, or property.'" *Elmore v. Cleary*, 399 F.3d 279, 282 (3d Cir. 2005) (alterations in original) (citing *Alvin v. Suzuki,* 227 F.3d 107, 116 (3d Cir. 2000)).

After their review of the complaint, the defendants believed that Jacobs was alleging a deprivation of a property interest in continued employment. *See* Defs.' Br. at 50–52. However, in Jacobs' subsequent briefing, he contends that his discharge from public employment gave rise to a liberty interest because it jeopardized his reputation, honor, or integrity. *See* Pl.'s Mem. at 50.

For this type of Fourteenth Amendment argument,

[a] public employee who has been dismissed has a cognizable liberty interest under § 1983 when the dismissal is based upon charges which stigmatize the employee and the employer creates and disseminates a defamatory impression about the employee in connection with the termination. The defamation must occur in the course of terminating the individual's employment.

When a public employer has impugned an employee by defamatory remarks in the course of a termination, due process requires that the employer provide a name-clearing hearing.  It is the failure of a public employer to provide a name clearing hearing that is an affront to the employee's due process rights.  Thus, where due process has been denied, the appropriate remedy is to afford an aggrieved employee a name-clearing hearing.

---

discharge in the relevant section of their opposition brief, they provided no response to the City's argument that they had failed to identify a tangible employment action for purposes of hostile work environment. This failure alone supports a finding of abandonment[.]"); *Campbell v. Jefferson Univ. Physicians*, 22 F. Supp. 3d 478, 487 (E.D. Pa. 2014) ("[W]hen a plaintiff responds to a defendant's summary judgment motion but fails to address the substance of any challenge to particular claims, that failure constitutes an abandonment of th[o]se causes of action and essentially acts as a waiver of these issues." (citations and internal quotation marks omitted)).

*Freeman v. McKellar*, 795 F. Supp. 733, 738 (E.D. Pa. 1992) (internal citations and quotation marks omitted).

Here, there is no need to consider whether Khan and McKevitt disseminated a defamatory impression about Jacobs in the course of terminating his employment because "even a discharged employee must allege that he timely requested a hearing to clear his name and that the request was denied." *Id*. at 739. The record contains no allegation that Jacobs ever (1) requested such a hearing and (2) had that request denied.

The court having found that Khan and McKevitt's conduct amounts to neither a violation of the First nor Fourteenth Amendments, even in the light most favorable to Jacobs, it is unnecessary to determine whether any such constitutional violation was clearly established at the time of the termination. Khan and McKevitt are therefore entitled to qualified immunity on the section 1983 claim. Accordingly, the court will grant the defendants' motion for summary judgment as to that claim.

### 4.   Pennsylvania Whistleblower Claim

Jacobs also asserts a claim for violation of the Pennsylvania Whistleblower Law. Having dismissed with prejudice Jacobs' federal claims, the court will not exercise supplemental jurisdiction over any state-law claims. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if-- . . . (3) the district court has dismissed all claims over which it has original jurisdiction . . . ."). As the Supreme Court instructs:

> Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well. Similarly, if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals.

*United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726–27 (1966). Here, the court finds no basis to retain supplemental jurisdiction over the state-law claim and will dismiss it without prejudice to Jacobs bringing the claim in the appropriate state court.

### IV.    <u>CONCLUSION</u>

Jacobs' FMLA request, without a causal link to his termination, cannot shield him from the County's power to terminate him for other, unprotected reasons. For the reasons set forth above, the court will grant summary judgment in favor of the defendants on the FMLA claim and the section 1983 claim. With no federal-law claim remaining, the court will dismiss without prejudice the state-law Pennsylvania Whistleblower Law claim.

A separate order follows.

BY THE COURT:


<u>/s/ *Edward G. Smith*    </u>
EDWARD G. SMITH, J.